CARRINGTON *v.* LENTZ *et al.*

*(Circuit Court, E. D. Missouri, E. D.* September 24, 1889.)

1. VENDOR AND VENDEE—BONA FIDE PURCHASERS—EQUITABLE TITLE.

Complainant claimed land under deed from S., who was alleged to have bought it from the county. There was no direct evidence of a sale to S., but it appeared that the county had taxed the land, and he had paid the taxes; that in a book preserved in the office of the clerk, but not one of the records of the county, there was a statement of the sale to him; that in one of the official books there was an entry of money received from him in payment for the land; and it appeared from one certificate, signed by the register of the county, that the land had been sold to S., and from another, signed by the receiver of the county, that he had paid for it. Defendant afterwards bought the land from the county, but it was proven that he had access to all of the records, and had notice before the sale was completed that complainant claimed the property. *Held*, that the equitable title was in complainant, and defendant would be compelled to convey the legal title to him.

2. COSTS—REFUSAL TO DISCLOSE INTEREST.

The fact that a defendant holds a contract in respect to the land, and refuses to produce it, will justify a decree divesting him of all title, and subjecting him to costs with the other defendants.

3. WASTE—WHO IS LIABLE.

Though a defendant assisted in obtaining the title, yet, if he did not take part in, or receive benefit from, the waste to the property, damages will not be decreed against him.

In Equity. Bill to compel the conveyance of legal title.

*William H. Clopton,* for complainant.

*E. R. Lentz,* for defendants.

BREWER, C. J. In this case is a bill filed by complainant, alleging that he has the equitable title to a tract of land in Butler county; that the legal title is in defendants; and seeking to charge them as trustees for him; to compel the vesting of the legal title in him; to recover possession; and have an accounting for waste. The land is what is known as "swamp land." The defendant Potter obtained title from the county in 1887. Complainant insists that in 1857 one James Stunson bought and paid for the land. By the act of September 28, 1850, the swamp lands in Missouri were granted to the state of Missouri. 9 U. S. St. at Large, 519. By the act of the legislature of Missouri of March 3, 1851, (Laws 1851, p. 238,) and the act of February 23, 1853, (Laws 1852–53, p. 108,) the title to these lands passed to the county of Butler. So held by the supreme court of the state in *Linville* v. *Bohanan*, 60 Mo. 554, and *Mitchell* v. *Nodaway County*, 80 Mo. 264. By the act of March 1, 1855, (Laws Mo. 1854–55, p. 154,) the clerks of the several county courts were made *ex officio* registers, and the treasurers *ex officio* receivers, for the purpose of performing all duties in respect to the sale of swamp lands in their respective counties. By other statutes the counties were authorized to sell, and by an act of November 5, 1857, (Laws 1857, p. 258,) irregular sales were ratified.

Now, the first and pivotal question is whether Stunson bought and paid for these lands. There is no direct testimony of purchase or payment. Stunson is dead. It appears that the land was taxed by the county, and that Stunson, and those claiming under him, paid the taxes.

Of course the land, while it belonged to the county, was not taxable, and the fact that it was taxed, and the taxes paid by Stunson, is evidence that it had been sold, and sold to Stunson. There is found in the office of the county clerk of Butler county a book which is marked "Receiver's Register of Swamp Lands of Butler County, Missouri." I should judge from the testimony that it was not looked upon as one of the official county records, and yet it was preserved as a book of the office, and on that book is a statement of the sale, describing the lands, the purchaser, and the price. There is also in one of the official books of the county, (Record D,)—an entry of a receipt from James Stunson of warrants, $240; and on the front leaf of that book is written, "Charges of money received for swamp lands;" and at the head of the first page is written, "Treasurer of Butler county, in account current on account of swamp-land funds of said county." There is also in the office of the state register of lands two certificates,—one signed by the register of that county, and the other by the receiver of the county; the one showing a sale to James Stunson of this land, and the other payment for this land. It is contended on the part of defendants that those certificates are not in form. They should have been simply receipts, as prescribed by the statute, instead of certificates. Be that as it may, these various records in the county offices and in the state land-office, coupled with the fact that the land was subjected to taxation, and taxes paid by James Stunson and those claiming under him, is satisfactory evidence of a sale to him, and, in the absence of all contradictory evidence, sufficient to prove that he bought and paid for the land as claimed. On the records of the county is to be found a deed from James Stunson to the father of the present complainant, and one from such grantee to the present complainant, so that there can be no question but that the equitable title to these lands passed from the county, through Mr. Stunson, to the complainant.

It is further insisted by the defendants that Mr. Potter is a *bona fide* purchaser without notice; that the entries in those books in the county clerk's office were not entries made by authority of statute, and therefore furnished no constructive notice; and that Mr. Potter in fact had no actual notice. There is testimony—contradicted, it is true, but testimony which commends itself to the consideration of the court—that some time before Mr. Potter purchased he was informed that this complainant owned the land, and was holding it for sale. All these entries on the books of the state land-office and on the books found in the county clerk's office, as well as the entry on the county clerk's official record, were within his reach, if he had been anxious to find whether there had been a prior sale. More than that, after the negotiations for a purchase, and before the deed was made to him, the county court was advised that the title was in this complainant. It thereupon rescinded the order of sale, and of that Mr. Potter unquestionably had information. Indeed he threatened the court with *mandamus* to compel a deed. We are clear that Mr. Potter does not stand in the position of a *bona fide* purchaser. He either knew of the outstanding equitable title, or was put in posses-

sion of information sufficient to compel an inquiry. The equitable title being in the complainant, and Potter having taken with notice of such equitable title as against him, complainant is entitled to a decree. Mr. Nasmith stands in no better position, for he simply furnished money to Mr. Potter, who acted in all things as his agent, and notice to the agent is notice to the principal.

Mr. Lentz files a disclaimer, and asks to be discharged with his costs. But he holds a contract from Mr. Potter in respect to part of the land. He refuses to produce such contract, and hence we are not advised of its provisions. But the fact that he holds some kind of a contract is sufficient to justify a decree against him divesting him of all title, and subjecting him, with the others, to the costs of this suit. A decree will go canceling the title held by all the defendants, and vesting it in the complainant, and directing, further, that the defendants deliver to the complainant, upon production of a copy of the decree of this court, within five days, possession of the land, and that, upon a failure to so deliver possession, a writ of assistance be issued to put him in possession.

With respect to the damages it appears that since his purchase Mr. Potter, for himself, his children, or his principal, has stripped the land of its timber. The value of the waste done is estimated differently by different witnesses. Mr. Lane, who was the agent of the complainant, says that there was about 295 acres of timber, and that the value of that timber was $4 an acre. We do not think that this is a case in which the court ought to strain a point to relieve from responsibility, for it looks very much as though it was a scheme to get a semblance of title in order to strip the land of the timber. We think $900 would be a fair amount of damages to charge against these defendants. So far as Mr. Lentz is concerned, while he was instrumental in obtaining the title from the county, yet that fact does not necessarily make him a participant in the waste done thereafter, and, unless he took part in such waste, or was to share in the profits therefrom, the mere fact that he assisted in obtaining the title does not make him responsible.

We are unable to see from the testimony that he has conducted himself in such manner as to be responsible for the destruction and carrying off of the timber. As to Mr. Lentz, the decree will be for possession, title, and costs, and as against the others, for possession, title, cost, and $900 damages.